Beth Davidson GILLETT, Appellant,

v.

The STATE of Texas, Appellee.

No. 57303.

Court of Criminal Appeals of Texas, En Banc.

Oct. 17, 1979.

Gerald Applewhite, Houston, for appellant.

Carol S. Vance, Dist. Atty., Robert A. Shults and Thomas L. Royce, Jr., Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

DOUGLAS, Judge.

The conviction was for the theft of a sweater of the value of over $20.00 and under the value of $200.00 as denounced by V.T.C.A., Penal Code, Section 31.03. The trial was before the judge. Punishment was assessed at thirty days in jail and a fine of $50.00, probated for six months.

Appellant contends that there was an illegal search by a security officer and evidence obtained as a result of the search should have been suppressed, and that the evidence is insufficient to show that she took the property without the consent of Foley's. We overrule these contentions and affirm.

Karen Boysen was a security officer for Foley's Department Store, but she was not a peace officer. While she was working at the Memorial City store near Spring Branch, she saw Beth Gillett pick up a red velour sweater, look about for a while and take it to a fitting room. The three fitting rooms or stalls had doors in the front and the partitions between them lacked at least one and one-half feet from reaching the floor. A sign was posted on the mirror which read: "Three garments per customer in the fitting room", and "These fitting rooms are under surveillance by female security." Another sign in the room read, "We prosecute shoplifting."

After Gillett entered a fitting room, Boysen entered an adjoining room, got down on her hands and knees and looked into the stall occupied by Gillett and saw her try on the sweater, roll it up, place it in her purse and leave the fitting area. Gillett passed twelve cash register locations and through

several departments of the store without attempting to pay for the sweater. Boysen stopped appellant, took her to the security office, retrieved the sweater and held her until police officers arrived.

Appellant contends that the observation by Boysen in the fitting room was an illegal search under Article 38.23, V.A.C.C.P., which provides:

"No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case."

At the outset, there has been no violation of the Fourth Amendment to the Constitution of the United States which provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The exclusionary rule under the Fourth Amendment applies only to governmental action. *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). There are many cases so holding. See Annot., *Admissibility, in Criminal Case, of Evidence Obtained by Search by Private Individual,* 36 A.L.R.3d 553 (1971). In *The Fourth Amendment Inapplicable Vs. The Fourth Amendment Satisfied: The Neglected Threshold of "So What",* by Judge Charles E. Moylan, Jr., Southern Illinois University Law Journal, Volume 1977, Number 1, it is written:

"Lest any doubt the continuing vitality of *Burdeau v. McDowell,* the Supreme Court gave it a clean bill of health in 1971 in *Coolidge v. New Hampshire* [403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564]:

" 'Had Mrs. Coolidge, wholly on her own initiative, sought out her husband's guns and clothing and then taken them to the police station to be used as evidence against him, there can be no doubt under existing law that the articles would later have been admissible in evidence. Cf. *Burdeau v. McDowell.* . . .'

"On this particular point, Justice Stewart spoke for a unanimous Supreme Court."

The State contends that since neither the Federal nor State constitutional provisions, nor the Texas law, were violated, Article 38.23, supra, does not apply.

It is not necessary to pass on that contention in this case because we hold that no right to privacy has been violated.

What people seek to preserve as private, even areas accessible to the public, may be constitutionally protected by the Fourth Amendment. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Further, areas such as public toilet stalls are private to the extent they are offered to the public for private, although temporary, use. *Katz v. United States,* supra; *Britt v. Superior Court,* 58 Cal.2d 469, 24 Cal.Rptr. 849, 374 P.2d 817; *State v. Bryant,* 287 Minn. 205, 177 N.W.2d 800. Such constitutional protection, however, extends only to the limits that the design, purpose and plan of the public facility affords so that, when the design is such that there is no right to expect absolute privacy, there can be no invasion of privacy. *Buchanan v. State,* 471 S.W.2d 401 (Tex.Cr. App.1971), cert. denied 405 U.S. 930, 92 S.Ct. 984, 30 L.Ed.2d 804.

In the present case, the posted sign on the mirror which would under nearly all circumstances be looked at by female occupants of a fitting room was notice that one could not expect privacy. This room was for use by the public on conditions established by the business. If appellant did not want to use the fitting room under the posted conditions, she was not compelled to do so. Her testimony that she did not see the sign did not have to be believed by the trial judge. The same is true about her testimony concluding that she expected privacy. See *Green v. State,* 566 S.W.2d 578 (Tex.Cr.App.1978).

In short, Foley's did not have to furnish her a place so that she could commit theft in private.

In the cases relied upon by appellant where it has been held that a right to privacy exists are not controlling because in those cases the places were public and there was no notice that one would be watched while in a booth or stall.

■ Appellant also contends that the State did not prove that she took the sweater without the owner's consent. Irene Ott testified that she was "security" assistant manager at the store and that the sweater belonging to Foley's was taken out of appellant's purse. It had four tags on it which meant that it had not been paid for. She related that no one gave appellant permission to take it and she did so without the effective consent of Foley's. The evidence is sufficient to show lack of effective consent of Foley's as alleged in the information.

No error is shown. The judgment is affirmed.

ROBERTS, Judge, dissenting.

This appeal presents a question that this Court never has addressed directly: Are the fruits of an unreasonable search made by a private person inadmissible under V.A.C. C.P., Article 38.23? The Court avoids the question by holding that "no right to privacy has been violated." In reaching that result the majority opinion engages in reasoning that is unacceptable to me. I also take the opportunity to comment on the applicability of Article 38.23 to private searches.

### I.

*A. Was there a search?*

When a person has gone into an enclosed booth to disrobe, and an investigator gets down on her hands and knees and peers under the wall to watch the person surreptitiously, there has been a search (in the plain meaning of that word) unless the person's normally justified expectation of privacy in such a place was abrogated. The

majority opinion is too abrupt in finding such an abrogation in this case.

The majority opinion summarizes its holding by saying, "In short, Foley's did not have to furnish [the appellant] a place so that she could commit theft in private." This may have the virtue of wit, but it has nothing to do with the applicable law. One might as well say that Sears did not have to furnish an appellant with a place to commit sodomy in private; of course, a restroom having been furnished, the law is that the appellant had a reasonable expectation of privacy in it. *Buchanan v. State*, 471 S.W.2d 401 (Tex.Cr.App.1971) (opinion by Douglas, J.), cert. denied, 405 U.S. 930, 92 S.Ct. 984, 30 L.Ed.2d 804 (1972). The same law would compel the conclusion that when a person has gone into a fitting room in a department store and closed the door, he has a reasonable expectation of privacy, and it is an unreasonable search for concealed guards to observe him by looking over or under walls or through cracks. *People v. Randazzo*, 220 Cal.App.2d 768, 34 Cal.Rptr. 65, 66 (1963); *United States v. Lima*, 25 Crim.L. 2095 (D.C.Super.1979); *People v. Diaz*, 85 Misc.2d 41, 376 N.Y.S.2d 849 (Crim. Ct.N.Y.1975); *State v. McDaniel*, 44 Ohio App.2d 163, 337 N.E.2d 173 (1975); W. La-Fave, 1 Search & Seizure, Section 2.4(c) (1978). The majority opinion holds that this law does not apply for two reasons.

First, says the majority opinion, "[I]n those cases the places were public." This is puzzling. One would think that this purported distinction would undercut, not support, the majority's position; "in those cases [where] the places were public" the expectation of privacy logically must be less than in those cases where the places are private. But I shall not linger over this curiosity. It seems plain to me that there is no difference in the public natures of a dressing room in Foley's and a toilet stall in Sears.

Second, the majority notes that in the cited cases, "there was no notice that one would be watched while in a booth or stall." While this is the determinative factor, it is

not analyzed correctly in the majority opinion.

One step in the majority's analysis is the axiom that the trial court could have disbelieved the appellant when she said that she did not see the sign and that she expected privacy.[1] This is true, but irrelevant. The dispositive question is not whether a person has a subjective expectation of privacy, but whether a person has an objectively justified right to privacy. It is an unreasonable transgression on the objective right that constitutes an unreasonable search. If the test were a subjective one, a searcher like Orwell's Big Brother could rather easily eliminate our subjective expectations of privacy simply by announcing his intention to search us. His searches would be unreasonable, nonetheless, because they would have violated our objectively justified right to privacy. (Conversely, an unjustified expectation of privacy, no matter how fervently it is subjectively held, can not render a search unreasonable.) See W. LaFave, 1 Search & Seizure, Section 2.1 (1978); Amsterdam, "Perspectives on the Fourth Amendment," 50 Minnesota Law Review 349, 384 (1974). This Court has applied this objective test correctly to a Fourth Amendment question in *Green v. State*, 566 S.W.2d 578, 583 (Tex.Cr.App.1978) (opinion by Douglas, J.). That case certainly did not present the incorrect analysis for which it is cited in the majority opinion.

The proper question is whether the sign makes a person's expectation of privacy objectively unjustified. The only thing that the majority opinion has to say about the sign is that "the posted sign on the mirror . . . would under nearly all circumstances be looked at by female occupants of a fitting room . . . ." (I suppose that this is an implied holding that the judgment would be reversed if the occupant had been male and, hence, less apt to look at mirrors.) The quaint remark in the majority opinion is not a sufficient analysis of the problem of the sign.

First, the sign is poorly designed to give notice that there may be an intrusion on the occupant's privacy. It is small: about six by twelve inches. It is poorly worded: "Three garments per customer in the fitting room and these fitting rooms are under surveillance by female security."[2] The notice that the "rooms are under surveillance by female security" is not prominently displayed, but is appended to another notice. The sign is not placed outside the room so that it might be read before the customer begins undressing, but is fixed to a mirror inside the room so that the customer might not notice it until she had undressed (if she noticed it at all).[3]

Second, and more importantly, it appears that people expect privacy in the fitting room even though they are fully aware of the sign. The security investigator, who had been trained in this method of surveillance and who used it in this case, testified nonetheless that when she went into a fitting room to try on clothes she expected privacy and she did not anticipate that anyone would be watching her. I think that the investigator's expectation of privacy was justified, as was the appellant's. Accordingly, I would hold that there was a search when the security guard got down on her hands and knees to peer under the wall into the closed fitting room where the appellant was disrobing.

### B. Was the search consented to?

The only other fact mentioned in the majority's analysis is the observation that

1. I cannot avoid thinking that the appellant's actions in stealing the sweater are rather strong corroboration of her testimony that she expected privacy in the booth.

2. While testifying, the security investigator twice read the sign aloud. Both times it appears as one long sentence. The court approved the record without objection. A photograph of the sign was admitted into evidence, but the words are too small to be read.

3. I note that the purpose of the first part of the sign is to inform the customer that she may take only three garments into the fitting room. This makes even more curious the placement of the sign inside the fitting room, for the customer will already have selected a number of garments and brought them into the room, and the sign will not have had the intended prophylactic effect.

the fitting room was made available under posted conditions which the appellant could have avoided by not using the room. Although the majority opinion does not use the term "consent," it seems to be saying that the appellant, by her use of the room, impliedly consented to be searched. Of course, this would be relevant only if there was a search. If the majority were completely satisfied with their holding that there was no search, they would not need to add this makeweight suggestion that the search was consented to. But more must be said of this "consent factor."

Some courts have raised the question of consent in analyzing searches of airplane passengers and jail visitors who were confronted with signs similar to the one in this case.

"Even though it . . . [is] somewhat easier to fit cases of the type just described within the consent category, it is neither necessary nor desirable to do so. Consent in any meaningful sense cannot be said to exist merely because a person (a) knows that an official intrusion into his privacy is contemplated if he does a certain thing, and then (b) proceeds to do that thing. Were it otherwise, the police could utilize the implied consent theory to subject everyone on the streets after 11 p. m. to a search merely by making public announcements in the press, radio and television that such searches would be undertaken. And there are other problems. . . . These difficulties can be avoided by simply asking whether these inspection activities meet the reasonableness requirement of the Fourth Amendment, an inquiry in which it will nonetheless be relevant that advance notice was given of the circumstances in which a search may occur." W. LaFave, 2 Search & Seizure, Section 8.2(1) (1978) (footnotes omitted).

As long as the majority opinion is tacitly admitting that there was a search in this case, it should analyze the search in terms of reasonableness rather than consent.

### C. Was the search reasonable?

"Unfortunately, there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." *Camara v. Municipal Court,* 387 U.S. 523, 536–537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967). Unquestionably, Foley's has a need to prevent theft. This need must be distinguished from the activity of gathering evidence of crime for the purpose of prosecution. See, e. g., *United States v. Davis,* 482 F.2d 893, 910–912 (9th Cir. 1973). To be reasonable, a search should be no more intrusive than is necessary to achieve its legitimate purpose. W. LaFave, 3 Search & Seizure, Section 10.7 (1978). In this case, Foley's could have satisfied its need to prevent theft had the investigator simply waited outside the fitting room to see that the appellant emerged with the sweater that she took in, and to see that the sweater was replaced on the rack. Instead, the investigator chose to gather evidence by engaging in a very intrusive search.[4] Searches that are personal in nature and aimed at discovering evidence of crime involve a higher degree of invasion of privacy than mere inspection activities. See *Camara v. Municipal Court,* 387 U.S. 523, 537, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

Assessing intrusions that were virtually identical to those presented by the instant case, courts have concluded that the searches were unreasonable. *People v. Randazzo,* 220 Cal.App.2d 768, 34 Cal.Rptr. 65, 66 (1963); *State v. McDaniel,* 44 Ohio App.2d 163, 337 N.E.2d 173 (1975).

Notice in advance that a search might occur is a factor to be considered in determining the reasonableness of a search like the instant one.[5] This factor is rather a weak one in this case. There was no proof that the appellant actually had notice that she would be searched if she went into the fitting room, and the sign was not suffi-

---

**4.** "Q When she took her blouse off what could you see? Was there a brassiere underneath there?
"A Uh-huh. You can see all the way up."

**5.** See part B above.

cient to eliminate a reasonable expectation of privacy.[6]

In summary, the need to search was clear but not overwhelming, the invasion of privacy was great, the search was more intrusive than the legitimate purpose justified, and the advance notice was unsatisfactory. On balance, I would hold that the search was unreasonable.

I recognize that judges could disagree in evaluating the facts of this case, but the approach to the analysis of the case should be mandated by the legal principles that I have discussed. The unfortunate feature of this case is that the holding of the majority opinion would apply equally well if this search had been made by a police officer. If it is applied to Professor LaFave's hypothetical, in which the police search everyone found on the street after 11 p. m. after announcing their intention to do so, the only logical result will be to hold that there was no search because there was no subjective expectation of privacy. Under the majority opinion, any Orwellian invasion of privacy could be held not to be a search, so long as a small, cryptic sign has been posted in advance. I have every hope that, when faced with such cases, the Court will return to a proper analysis; I wish that it had done so today.

## II.

As a matter of federal law, the Fourth Amendment to the United States Constitution is a restriction only on government action. *Burdeau v. McDowell*, 256 U.S. 465, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1921). A majority of courts hold that the exclusionary rule of the Fourth Amendment[7] does not bar the admission of evidence acquired unlawfully by private persons. Annotation, 36 A.L.R.3d 553 (1971).[8]

Of course, states are free to establish laws that afford greater protections than the minimum requirements of the federal constitution. See *Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); *Milton v. State*, 549 S.W.2d 190, 192 (Tex.Cr.App.1977); *Olson v. State*, 484 S.W.2d 756, 762 (Tex.Cr.App.1972); Brennan, "State Constitutions and the Protection of Individual Rights," 90 Harvard Law Review 489 (1977). Texas has exercised this freedom more than once in its constitutions and laws.[9]

Therefore, in our determination of the admissibility of evidence acquired by private persons, we are not limited by Fourth Amendment doctrines if state law establishes stricter standards. At a time when some judges are displaying hostility to the constitutional exclusionary rule (if not to the Fourth Amendment itself),[10] it is important to remember that the legislative represent-

---

6. See part A, above.

7. See *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

8. Some courts and commentators have taken the position that private security guards, especially if they are licensed and have authority to arrest, are *de facto* officers of the government and subject to the Fourth Amendment. *United States v. Lima*, 25 Crim.L. 2095 (D.C.Super. April 16, 1979); *People v. Eastway*, 67 Mich. App. 464, 241 N.W.2d 249 (1976); *People v. Diaz*, 85 Misc.2d 41, 376 N.Y.S.2d 849 (Crim.Ct. N.Y.1975); Sutherland, "Use of Illegally Seized Evidence in Non-Criminal Proceedings," 4 Crim.L.Bull. 215 (1968); 51 B.U.L.Rev. 464 (1971); 19 Stan.L.Rev. 608 (1967). See *DeCarlo v. Joseph Horne & Co.*, 251 F.Supp. 935 (D.C.W.D.Pa.1966). See also *People v. Zelinski*, 24 Cal.3d 357, 594 P.2d 1000, 155 Cal.Rptr. 575 (1979) (state constitution violated). This remains a minority view. Because I believe that state law calls for reversal, I do not think

it necessary to address this constitutional question.

9. See, e. g., Texas Constitution, Article I, Section 10 (requiring indictment by grand jury in felonies although states are not subject to the indictment requirement of the Fifth Amendment); *Whisenant v. State*, 557 S.W.2d 102 (Tex.Cr.App.1977) (Texas procedure for revoking probation affords far greater protections than those required by Fourteenth Amendment); *Butler v. State*, 493 S.W.2d 190 (Tex.Cr. App.1973) (Article 38.22, V.A.C.C.P., more strict than Fifth Amendment regarding oral confessions).

10. See, e. g., *California v. Minjares*, —— U.S. ——, 100 S.Ct. 9, 61 L.Ed.2d 892 (1979) (Rehnquist, J., in chambers); Wilkey, "The Exclusionary Rule: Why Suppress Valid Evidence?" 62 Judicature 215 (1978).

atives of the people of Texas enacted and repeatedly reenacted a broader, statutory rule of exclusion long before it was required by the federal courts.

In its first paragraph, Article 38.23, V.A. C.C.P., provides: "No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." [11] This statute goes much beyond the exclusionary rule of the Fourth Amendment. C. McCormick & R. Ray, 1 Texas Law of Evidence, Section 473 (2d ed. R. Ray & W. Young 1956). It is on this statute that the appellant relies.

Formal sources of the legislative history of Texas statutes have been nearly non-existent until recent years. See M. Boner, A Reference Guide to Texas Law and Legal History, chapter 4 (1976). The legal and historical context of this statute and its predecessors is tolerably clear, and a review of it is helpful.

The statute was born in the prohibition era. Although statewide prohibition did not come to Texas until 1919, prohibition on the "local option" of counties, precincts, towns, and cities had been allowed since 1876. See Texas Constitution, Article 16, Section 20 (1876, amended 1891, 1919, 1933, 1935, 1970). When statewide prohibition was adopted, 199 of the (then) 252 counties in Texas already had been voted "dry" as a local option, and 43 more were practically dry. A. Thomas & A. Thomas, "Interpretive Commentary," 3 Vernon's Annotated Constitution of the State of Texas 198, 199 (1955). The long Texas experience with local option and prohibition included militant activity by a number of prohibitionist organizations. A. Thomas & A. Thomas,

supra. Among these organizations were "Law and Order Leagues," comprising private persons who pledged to use all efforts within their power to secure testimony and otherwise to aid officers in convicting persons charged with violating the law, especially the local option law. See *Counts v. State,* 78 Tex.Cr.R. 410, 181 S.W. 723 (1916); *Deadweyler v. State,* 57 Tex.Cr.R. 63, 121 S.W. 863 (1909). The opinions of this Court indicate that it was not a rare event for private persons to join peace officers in searching for, and seizing, alcoholic beverages. See, e. g., *Bolt v. State,* 112 Tex.Cr.R. 267, 16 S.W.2d 235 (1929); *Stach v. State,* 97 Tex.Cr.R. 280, 260 S.W. 569 (1924); *Cadan v. State,* 95 Tex.Cr.R. 645, 255 S.W. 428 (1923); *West v. State,* 93 Tex.Cr.R. 288, 247 S.W. 534 (1922).

It was such a case, in which private "gentlemen" joined with officers on a search for whisky, that gave rise to Article 38.23, V.A. C.C.P. The case was *Welchek v. State,* 93 Tex.Cr.R. 271, 247 S.W. 524 (1922). In that opinion, this Court announced that it would not follow the exclusionary rule of such cases as *Amos v. United States,* 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921), and *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), under which the federal courts suppressed evidence seized in violation of the Constitution. The opinion was the subject of much discussion.[12] We have expressly noted that the intent of the 39th Legislature was to change the *Welchek* rule when it enacted two statutes, one of which was the predecessor of Article 38.23. *Odenthal v. State,* 106 Tex.Cr.R. 1, 290 S.W. 743, 748–749 (1927); see C. McCormick & R. Ray, 1 Texas Law of Evidence, Section 473 (2d ed. R. Ray & W. Young 1956).

---

11. The second paragraph requires that the jury be instructed to disregard any evidence that it believes (or has a reasonable doubt) was obtained unlawfully. This paragraph was added when the current Code of Criminal Procedure was adopted (1965 Texas Gen.Laws, Chapter 722). The paragraph is not material to this case.

12. See Rowan, "Admissibility of Evidence Obtained in Violation of Constitutional Rights," 2 Texas L.Rev. 208 (1924); 2 Texas L.Rev. 249 (1924); 1 Texas L.Rev. 473 (1923).

The first of these statutes provided:

"Sec. 1. * * * No evidence obtained by an officer *or other person* in violation of any provision of the constitution or laws of the State of Texas, or of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

"Sec. 2. The fact that there has been used against citizens of this State evidence obtained in violation of the constitution of the State, and that there is now no statute expressly forbidding the same, creates an emergency . . . ." 1925 Texas General Laws, Chapter 49 (emphasis supplied).

Section 1 is substantially identical to the first paragraph of the present Article 38.23.

The other statute began by reciting Article I, Section 9 of the Texas Constitution.[13] It then made it a misdemeanor, punishable by six months in jail and a fine of from $100 to $500, "for *any person* or peace officer, or State ranger, to search the private residence, actual place of habitation, place of business, person or personal possessions of any person, without having first obtained a search warrant as required by law." 1925 Texas General Laws, Chapter 149, Sections 2 and 3 (emphasis supplied).

These statutes evince the intent of the Legislature to make the prohibition of unreasonable searches and seizures applicable to all persons, whether officers or not.

The 41st Legislature repealed the act that made it a crime to conduct a warrantless search, because it was "retarding and hindering the enforcement of the Criminal laws . . . and . . . hampering and embarrassing the Peace officers . . . ."[14] A companion act reenacted the statutory rule of exclusion.[15] The language that excluded evidence obtained unlawfully "by an officer or other person" was retained. The only change was the insertion of the words "Constitution of the" before the words "United States of America." The effect of the change was to make admissible evidence that was obtained in violation of federal laws. The statute continued to exclude evidence obtained in violation of the federal constitution or the constitution or laws of the state.

When it was held that this amendment made admissible wiretap evidence obtained in violation of the Federal Communications Act,[16] the 52nd Legislature promptly reacted.[17] It reinstituted the ban against evidence obtained in violation of federal laws, which restored the substance of the original statute. This 1953 version provided:

"Sec. 1. No evidence obtained by an officer or other person in violation of any provision of the Constitution or laws of the United States or of this State shall be admitted in evidence against the accused on the trial of any criminal case.

"Sec. 2. The fact that the present law authorizes evidence obtained in violation of the laws of the United States to be used in evidence against an accused upon trial for a violation of the laws of this State, creates an emergency . . . ." 1953 Texas General Laws, Chapter 253.

Once again, the language that excluded evidence obtained unlawfully "by an officer or other person" was retained.

The language was retained again when the current Code of Criminal Procedure was adopted in 1965 after a comprehensive reco-

---

**13.** "The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation."

**14.** 1929 Texas Gen.L., Second Called Session, Chapter 44 (Senate Bill 20).

**15.** 1929 Texas Gen.L., Second Called Session, Chapter 45 (Senate Bill 21).

**16.** *Schwartz v. State*, 158 Tex.Cr.R. 171, 246 S.W.2d 174 (1951), aff'd. sub nom. *Schwartz v. Texas*, 344 U.S. 199, 73 S.Ct. 232, 97 L.Ed. 231 (1952).

**17.** 1 S.Tex.L.J. 69 (1954).

dification.[18] Only grammatical changes were made, and a second paragraph was added.[19]

It is significant that the application of the statute to "other persons" did not change when the statute was amended (and a companion act repealed) in 1929, nor when the statute was amended in 1953, nor when the statute was amended in 1965. Not merely once, but four times, has the Legislature chosen to exclude evidence that would otherwise be admissible under doctrines of the federal constitution.[20] Not merely once, but four times, has the Legislature expressly made this statute applicable to the acts of officers and other persons alike, if their acts are in violation of our constitutions or laws.

The question of the applicability of this statute to the acts of private persons has not been discussed by this Court, although there is an illuminating contrast between the opinions in *Gaines v. State*, 95 Tex.Cr.R. 368, 251 S.W. 245 (1922), and *Ramirez v. State*, 123 Tex.Crim. 254, 58 S.W.2d 829 (1933). In the former case (decided before the enactment of the statute in question), we wrote, of the fruits of an illegal search and seizure, "[I]t would seem that the information obtained by the post office inspector, he not being a state officer, would not preclude the use of the facts acquired by him by the state authorities in trying the case." 95 Tex.Crim. at 374, 251 S.W. at 248.

In the latter case, two United States Immigration Service inspectors made an illegal search and seizure. Although they, like the post office inspector, were not officers under our laws, we did not hesitate to apply the statute in question (which was enacted in the interim between the cases).

The Constitution and laws of the State of Texas provide that, "The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches . . . ."[21] The State argues that an unreasonable search or seizure by a private person is not in violation of these provisions because they apply only to officers, as does the Fourth Amendment. The State thus would have us hold that Article 38.23 does not exclude evidence obtained by the unreasonable search and seizure of a private person. By this reasoning, Article 38.23 would have no effect on the unreasonable searches of private persons. To adopt this reasoning would be to ignore one of the evils that the legislative history shows the Legislature intended to remedy. This we should not do. See Article 10(6), V.A.C.S.; Article 5429b–2, Section 3.03, V.A.C.S.[22] Article 38.23 was enacted at a time when private persons frequently made unreasonable searches and seizures, and it was a specific response to this Court's holding in a case that involved a search in which private persons joined. To give full effect to the statute, we must hold that it applies to

---

**18.** 1965 Texas Gen.L., Chapter 722, Section 1, Article 38.23.

**19.** See note 11, supra.

**20.** "The Texas statute lays down a rule far broader than that existing in any other state and goes much beyond the doctrine of the *Boyd* and *Weeks* cases. In the first place, while the federal rule excludes only evidence illegally obtained by federal officers, and those cooperating with them, the Texas statute makes a clean sweep and excludes evidence thus obtained by anyone." C. McCormick & R. Ray, 1 Texas Law of Evidence, Section 473 (2d ed. R. Ray & W. Young 1956).

**21.** Texas Const., Art. 1, Sec. 9; Art. 1.06, V.A.C.C.P.

**22.** "In all interpretations, the court shall look diligently for the intention of the Legislature, keeping in view at all times the old law, the evil and the remedy." Article 10(6), V.A.C.S.

"In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the
(1) object sought to be attained;
(2) circumstances under which the statute was enacted;
(3) legislative history;
(4) common law or former statutory provisions, including laws upon the same or similar subjects;
(5) consequences of a particular construction;
(6) administrative construction of the statute; and
(7) title, preamble, and emergency provision."
Article 5429b–2, Sec. 3.03, V.A.C.S.

evidence obtained through unreasonable searches or seizures that are made by officers or other persons alike.

In this case, the security investigator testified that her duty was to protect the assets of Foley's in any way that she could. However that may be, the Legislature has imposed on the courts of this State a different duty: to exclude evidence obtained through unreasonable searches or seizures by officers or other persons. It was error for the trial court to deny the motion to suppress the evidence. Therefore, I dissent.

PHILLIPS and CLINTON, JJ., join in this dissent.